Cosandra ROGERS, Plaintiff,

v.

INGERSOLL-RAND COMPANY, Defendant.

Civil Action No. 95–0432.

United States District Court, District of Columbia.

July 16, 1997.

6

Charles C. Parsons, Washington, DC, for Plaintiff.

Terrence M.R. Zic, Washington, DC, William H. Robinson, Jr., Richmond, VA, for Defendant.

### MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on Defendant Ingersoll–Rand Co.'s Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial, and Plaintiff Cosandra Rogers' opposition thereto. For the reasons stated below, the Court denies Defendant's motion.

**Background**

This case is a products liability personal injury action. It came about following an incident on April 17, 1992, which injured Plaintiff Cosandra Rogers. Ms. Rogers is a resident of the District of Columbia. Ingersoll–Rand ("IR") is a New Jersey corporation. Ms. Rogers' employer, District Paving, was not a party to this action.

At trial, Ms. Rogers sought both compensatory and punitive damages from IR claiming that she was seriously and permanently injured by the company's Model MT–6520 milling machine. Ms. Rogers asserted 1) that the milling machine was defectively designed because it was unreasonably dangerous at the time it was sold, possessing known dangers which required IR to provide safety devices to prevent foreseeable injury to those people who worked in close proximity to the machine; 2) that IR acted negligently in its design, manufacture, or sale of the milling machine; and 3) that the dangerous condition of the milling machine breached an implied warranty of merchantability by IR that it would design, make, and sell only milling machines that were safe and free of defects, and fit for their intended purpose. After the close of evidence, the Court held that Ms. Rogers had not proven claims or defenses available solely to her implied warranty cause of action, and that it therefore merged with her strict liability claim. The jury therefore was not given the breach of implied warranty of merchantability claim.

IR denied that its machine was defectively designed, and denied liability to Ms. Rogers under any claim or theory. IR stipulated to the fact that the milling machine was potentially dangerous, but the company denied that the machine is unreasonably dangerous or defective due to a lack of mirrors, track guards, a kill switch, or a different mounting for its back-up alarm. IR said it was aware of these various devices, but made a determination that none would be effective in addressing the danger that would have prevented Ms. Rogers' accident.

IR further stated affirmative defenses that 1) District Paving's negligent failure to maintain or properly operate the milling machine was a superseding cause and the proximate cause of Ms. Rogers' accident; 2) Ms. Rogers was herself contributorily negligent; and 3) that the failure of District Paving's milling machine operator, Terrell Wilson, to see Ms. Rogers was the proximate cause of this accident. At the close of the case, IR moved for a directed verdict as to liability and punitive damages. The Court denied the motion, reserving the right to visit the issue of punitive damages should the jury award them.

Following a two-week trial and two-and-a-half days of deliberation, the jury returned a verdict for Ms. Rogers on both her negligence and her strict liability claims, and awarded compensatory damages in the amount of $10,200,000.00 and punitive damages of $6,500,000.00. The jurors answered 13 separate questions on a special verdict form, consistently finding IR liable for Ms. Rogers' injuries and damages. IR renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and moved for a new trial under Fed. R.Civ. P. Rule 59.

The evidence offered at trial was that on April 17, 1992, Ms. Rogers was working for District Paving as a flagger, the member of a road paving crew who directs traffic around repaving sites. Her duties required her to stand with her back to the rest of her crew members and the machines they were using, in order to flag oncoming vehicles around the machinery and the people working with it.

District Paving purchased an IR Model MT–6520 milling machine in April 1991. The milling machine is designed to grind up asphalt by means of a series of metal teeth running under the main chassis. The MT–

6520 does not have wheels, but moves on four tank-like "tracks" with metal grousers, or treads. It was one of these rear tracks which caused Ms. Rogers's injuries.

Around noon on April 17, 1992, the road crew on which Ms. Rogers was working decided to make one last pass over a particular portion of roadbed before breaking for lunch. The milling machine operator, Terrell Wilson, stopped to avoid passing over some manhole covers, which could severely damage the "teeth" of the asphalt grinding mechanism in the undercarriage of the machine. In his deposition testimony—which was read into the record at trial due to his unavailability—Mr. Wilson said that he looked backward and saw Ms. Rogers to the rear and side of the machine, and that he then put the machine into reverse. From the right-hand side of the operator's platform, the side away from where Cosandra Rogers stood, Mr. Wilson could not see Ms. Rogers because she was in one of the milling machine's blind spots. Shortly after Mr. Wilson began backing up the machine, other workers started running toward him waving their arms and shouting. Ms. Rogers had been partially pulled under the machine track and severely injured.

Ms. Rogers was taken to the Washington Hospital Center's MedStar Unit with extensive injuries to her left leg, hip, and abdomen. Her left leg was amputated above the knee, drains were put in her abdomen to help remove fluids, and metal rods were set in her pelvis in an attempt to stabilize the bones—which had been pushed apart by the force of the impact of the milling machine. She suffered—and is still afflicted by—a prolapsed uterus and bladder problems. IR stipulated to the fact that Ms. Rogers' injuries were due to contact with the milling machine's track, and similarly stipulated that her injuries required surgeries that caused Ms. Rogers' to incur significant medical expenses, the amount of which IR did not contest at trial.

Ms. Rogers spent three months in the Intensive Care Unit of the Washington Hospital Center, and the next two months at the National Rehabilitation Hospital undergoing intensive physical therapy. More than a year after her initial injury, she had a second pelvic surgery, to stabilize her pelvic girdle and left sacroiliac joint, in the hope that it would relieve the pain which kept her from being able to stand for long periods or walk for short ones. The surgery, her orthopedic surgery expert testified, relieved about 50% of her pain but did not give her the mobility she had hoped for.

During her hospitalization and rehabilitation, Ms. Rogers' four children were sent to live with various relatives. She lost her apartment. When she was released, Ms. Rogers stayed for a time in one of her sister's homes, and later lived with other relatives on a temporary basis. She now lives with a female friend who acts as home care companion, in a ground-floor apartment that is wheelchair-accessible but not fully equipped for a disabled person. She is unable to walk, can stand only for brief periods due to ongoing pain in her hip and back, and will not be able to return to her job as a flagger.

## Discussion

### Jurisdiction

Jurisdiction over this case was founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. As a result, the substantive law of the District of Columbia governs this dispute. (See *Schleier v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.,* 876 F.2d 174, 180 (D.C.Cir.1989)).

### Standard: Judgment As A Matter Of Law

Because judgment as a matter of law intrudes upon the rightful province of the jury, it is highly disfavored. This Circuit has emphasized that "[t]he jury's verdict must stand unless the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict." *McNeal v. Hi–Lo Powered Scaffolding, Inc.,* 836 F.2d 637, 640–41 (D.C.Cir.1988) (internal quotations and citation omitted); *accord Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 827 (D.C.Cir.1988), cert. denied, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989).

When conflicting inferences from the evidence are possible or where there is room for differences of opinion, the trial judge must

allow the case to go to the jury. *Id.* ("A directed verdict is proper only if there is no evidentiary foundation ... by which a reasonable juror could find for the party opposing the motion.") Even where it appears to the trial judge that the evidence is such that one party is entitled to prevail on a factual issue, if a contrary result is even possible the better course of action is to allow the issue to go to the jury and then, if necessary, enter a post-verdict judgment as a matter of law. *Id.*

Rule 50(a)(2), which governs the pre-verdict motion for judgment as a matter of law, requires the motion to "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Rule 50(b) states that when the Court either denies or does not initially grant such a motion, the case is deemed submitted to the jury subject to the Court's later determination of the legal issues raised in the motion. The motion "may be renewed" later, under Rule 50(b). "The precise claim made in the motion for judgment n.o.v. must have been made in the motion for directed verdict." *Whelan v. Abell,* 48 F.3d 1247, 1251 (D.C.Cir. 1995) (quoting *U.S. Indus., Inc. v. Blake Constr. Co.,* 671 F.2d 539, 548 (D.C.Cir. 1982)); accord Fed.R.Civ.P. 50 Advisory Committee's Note to 1991 Amendment[1] (remarking that new language explicitly requiring specificity in Rule 50 motions works to "alter[ ] the result" in cases where a court, by allowing less specificity, effectively circumvented the requirement that the later motion be based on grounds raised in the earlier motion). *Id.*

**Renewed Motion for Judgment as a Matter of Law**

Defendant Ingersoll–Rand has renewed its motion for judgment as a matter of law or, in the alternative for a new trial on several bases, some of which were specified precisely in its motion for a directed verdict while others were not. With the holding from *Whelan* in mind, the Court addresses those claims properly before it on the renewed

Rule 50 motion: IR's liability and the propriety of punitive damages.

**1) Strict Liability**

■ The D.C. Court of Appeals has adopted the principles of strict products liability set forth in section 402A of the Restatement (Second) of Torts. See *Warner Fruehauf Trailer Co., Inc. v. Boston,* 654 A.2d 1272 (D.C.App.1995), and *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720 & n. 6 (D.C.App.1985) (citing *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1356–7 (D.C.App.1978) and *Cottom v. McGuire Funeral Serv. Inc.,* 262 A.2d 807, 808 (D.C. 1970)). Section 402A imposes liability upon "one who sells any product in a defective condition unreasonably dangerous to the user or consumer," provided that (1) "the seller is engaged in the business of selling such a product," and (2) the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." *Payne,* 486 A.2d 712, 719–20. In order to recover, an injured plaintiff must demonstrate not only that the product is defective, but also that the defect proximately caused plaintiff's injury in that "but for the defect, the injury would not have occurred." *Payne,* 486 A.2d at 725.

■ In *Warner Fruehauf,* the District of Columbia adopted a four-step test for determining whether a seller should be strictly liable in tort for a defectively designed product:

1) the seller [must have been] engaged in the business of selling the product that caused the harm;

2) the product [must have been] sold in a defective condition unreasonably dangerous to the consumer or user;

3) the product [must have been] one which the seller expected to and did reach the ... consumer or user without any substantial

---

1. The Court notes that the 1991 amendments to the Federal Rules of Civil Procedure merged the traditional terms "directed verdict" and "j.n.o.v." into a single term: "judgment as a matter of law." Thus under Fed.R.Civ.P. Rule 50(a), a motion for a directed verdict is now called a motion for judgment as a matter of law, and a motion for j.n.o.v. under Fed.R.Civ.P. Rule 50(b) is considered a renewal of the first motion.

change from the condition in which it was sold; and

4) the defect [must have been] a direct and proximate cause of the plaintiff's injuries. *Warner Fruehauf,* 654 A.2d 1272, 1276. The opinion went on to analyze what constituted an unreasonably dangerous defect through the commonly-used risk/utility balancing test, which looks to "the risks, costs and benefits of the product in question and alternative designs" and compares "the magnitude of the danger from the product [to] the costs of avoiding the danger." *Id.* (quoting *Hull v. Eaton Corp.,* 825 F.2d 448, 453 (D.C.Cir. 1987.))

██ "Implicit in this analysis is that a court should weigh only those risks of a product against which a manufacturer has some duty to guard a worker, including those risks that emerge from the normal use of the product or objectively foreseeable misuse of the product." *Ferguson v. F.R. Winkler GMBH & Co. KG,* 79 F.3d 1221 (D.C.Cir.1996)(quoting *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 726); cf. *Young v. Up–Right Scaffolds, Inc.,* 637 F.2d 810, 814 (D.C.Cir.1980) (finding no threshold duty to warn if risk is not reasonably foreseeable).

## Defense: Superseding Misuse/Foreseeability

██ IR claims that District Paving's misuse of the milling machine was a superseding cause of Ms. Rogers' injuries. Use of a product in a manner which a manufacturer could not reasonably foresee is misuse under

*Payne v. Soft Sheen Products,* 486 A.2d 712 (D.C.App.1985).

██IR categorizes District Paving's misuses as those of improper maintenance, and a failure to operate the milling machine properly. There was no direct evidence at trial that District Paving improperly maintained its three IR Model MT–6520 milling machines; only conflicting testimony about whether the backup alarm on the milling machine was working at all or intermittently on the day of Ms. Rogers' injury.

What was established was that Mr. Wilson, the operator of the milling machine, had looked to see that Cosandra Rogers was clear of the rear of the machine before he began backing up, but that he could not see her again from the opposite side of his platform while the machine was in motion. The jury found that District Paving had misused the milling machine (either through its maintenance and/or in the actions of its driver). The jurors also found that District Paving's misuse had been a proximate cause of Ms. Rogers' injury. However, the jurors found IR liable for Ms. Rogers' injuries and damages—as they were allowed to do under the instructions they were given.[2]

Claiming that District Paving's misuse absolved it of liability in Ms. Rogers' injury, IR overlooks two things: 1) that it was the province of the jurors to determine the facts—which they did; and 2) that in order for any misuse to relieve IR of its liability, that misuse must have been unforeseeable. While it was by no means shown that District Paving improperly maintained or failed to maintain its milling machine, the Court finds

2. Those Jury Instructions state:

**CONCURRING CAUSES—EACH LIABLE**

There may be more than one proximate cause of an injury; that is, several negligent acts may work together. Each person whose negligent act is a proximate cause of an injury is responsible.

It is no defense that some other person not joined as a defendant in this action participated in causing this injury, even if it should appear to you that the negligence of the other person was greater.

**MISUSE OF PRODUCT**

The Defendant has asserted the defense that if the Plaintiff's injury was caused by its product, the milling machine, then such product was misused by her employer and such negligent misuse

was an intervening and superseding cause of her injury.

Product misuse is defined as use of a product that could not be reasonably foreseen by the Defendant. The manufacturer of a product has an obligation to anticipate reasonably foreseeable risks of harm arising in the course of proper use, and to warn of those risks. Proper use includes the incidental and attendant consequences that accompany normal use.

If you find that the Defendant should have reasonably foreseen that the Plaintiff's employer would misuse the product in the manner in which it did, then you should find that the Plaintiff's injuries were not caused by misuse of the product.

that the jury could have determined that a large-scale manufacturer of road construction machinery like IR should have reasonably anticipated that its machinery, subjected to "real world" conditions, might not be perfectly attended to in a clockwork fashion. By the same token, the Court finds that the jury could have determined that IR should have reasonably anticipated that human error might be a factor when humans are operating large machines, and that the company then had some duty to protect against such foreseeable human error in as many ways as possible—some of which the jury might have found to have been proposed by Ms. Rogers' alternative safety design features. Under *Ferguson,* a manufacturer has a duty to protect workers from those risks that emerge from the normal use of the product. Certainly the evidence presented at trial and the testimony of IR's Frank Martinelli and Paul Willis—about reports from service reps regarding non-functioning backup alarms, and a call to a coroner's inquest following a deadly milling machine incident more than a year before Ms. Rogers' injury—coupled with the testimony of Herr Joachim Kobow about his demands in 1985 for more safety features on the milling machine he was buying, show an emerging risk of which IR was aware and against which IR had a duty to guard road crew workers.

IR's claim that the Court failed to give a jury instruction to which it was entitled is without basis. Adequacy of the warning on the milling machine was not one of Ms. Rogers' claims against the company. Nor was it argued during trial. That the milling machine bore warnings from both IR and District Paving was mentioned during testimony. But Ms. Rogers did not claim the adequacy of IR's warning was a safety design defect. The jury instructions indicated that IR had a duty to warn of risks of ordinary use that were reasonably foreseeable to the company.

It is well-established that "[a] defendant is entitled to an instruction on a defense theory if it has a basis in the law and in the record." *Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1044 (9th Cir.(1989)), (affirmed on other grounds, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990)). Never-

theless, "[a]s long a district judge's instructions are legally correct ... [s]he is not required to give them in any particular language," *Miller v. Poretsky,* 595 F.2d 780, 788 (D.C.Cir.1978); and jury instructions are not considered erroneous if, when viewed as a whole, "they fairly present the applicable legal principles and standards." *Hasbrouck,* 842 F.2d at 1044,(citing *EEOC v. Atlantic Community Sch. Dist.,* 879 F.2d 434, 436 (8th Cir.1989)).

The Court has no basis to conclude that the jurors failed to consider the instructions as a whole, especially in light of the Court's instruction that they shall be so considered. Since there was an instruction on the kind of warning IR was required to give, and because there was no claim against it regarding any failure to warn, the Court concludes that IR was not "deprived of a defense to which it was entitled."

After hearing almost two weeks of testimony, deliberating for two-and-a-half days, and working its way through a complex verdict sheet, the Court is confident that this jury did not make inconsistent findings. These jurors took their time in reaching their determinations, and filled out the verdict sheet in a consistent and clear manner. The jury's finding of misuse by District Paving and further finding IR liable is not the result of confusion or misunderstanding. From their answers on the verdict sheet, the jurors indicated that they did not find District Paving's misuse of the machine to be the proximate cause of Ms. Rogers' injuries and damages. That the jurors concluded there was misuse, but that it did not absolve IR from liability, indicates to the Court that the jurors either found any misuse by District Paving was not the proximate cause of Ms. Rogers' injuries, or that IR should reasonably have foreseen the actions of District Paving. Or both.

**2) Punitive Damages**

The Court is exceedingly dismayed at the level of disingenuousness in IR's statement that "uncontradicted testimony" shows the design defects identified by Ms. Rogers' expert were in fact the product of sound design judgment. No issue was more hotly contest-

**12**

ed during this trial, and there was great divergence of expert and lay opinion.

■ If a party's claim for damages is supported by the evidence, then she is entitled as a matter of law to have her theory submitted to the jury. *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 688 (D.C.1977). Ms. Rogers supported her claims that IR knew of alternative safety designs for its milling machine, but made a calculated, willful decision not only not to use them but not even to test them. Viewed in a light most favorable to her, as the Court must do for purposes of these motions, the jury could have determined that Ms. Rogers' evidence showed IR knew of both the unreasonable danger posed by its machine and other means available to address it—and that the company's decision to do nothing in the face of such a known hazard amounted to willful disregard for her safety and the safety of any others who might come in contact with IR's milling machine.

■ IR argues that its conduct with regard to the milling machine was not of the level contemplated as deserving a punitive damage award. The Court disagrees. Punitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury. *Franklin Investment Co. v. Homburg,* 252 A.2d 95, 98 (D.C. 1969). Proof of these elements may be inferred from the acts of the defendant and from circumstantial evidence. *Id.* The issue is ordinarily one for the trier of fact. *Id.* (See also *Mason v. Rostad,* 476 A.2d 662, 667 (D.C.1984).)

■ Called by Ms. Rogers, IR's own engineering services manager, Frank Martinelli—who identified himself as having safety design training and experience—answered a series of questions about the design of the milling machine. He responded to queries regarding various safety features which some of I–R's competitors had in use at the time the machine involved in Ms. Rogers' case was in production. When asked about track guards—which serve as a kind of fender or cover crossing the top of the machines' tracks and extending down over the tracks' front and sides—Mr. Martinelli admitted that the company knew of the track guard design but elected not to utilize it on the Model MT–6520. When asked why IR did not take a mock-up of the guard into the protoshop for testing, Mr. Martinelli responded that testing track guards would have been a complete waste of time. His response to questions about why the company did not test other of its competitors' safety devices drew similar kinds of responses. Mr. Martinelli further testified that it was perfectly reasonable for IR to take the backup alarm component from one line of its road construction machines—vibratory compactors—and install it on its milling machine line without any testing or change in the manner in which the alarm was attached to the chassis of the machine. This was disputed by both District Paving mechanic David McDaniels and Ms. Rogers' expert Dr. Vaughn Adams, who testified that the length of the bolts used and the lack of any fastener like cotter pins, jam nuts, or similar devices (which would withstand constant and heavy vibration) was a design problem that created a safety hazard.

Deposition testimony from IR's corporate officer, its products liability division's technical manager Victor Weintraub, was similarly firm in its insistence that each division was responsible for both its design and marketing of equipment and its responses to any complaints or comments from customers or service reps in the field. Mr. Weintraub's deposition testimony stressed that IR did not follow any clear chain of reporting responsibility, and that the company kept the relating of and response to outside information deliberately decentralized. The evasiveness of the corporate representative's answers contained in his deposition, as read into the record at trial, appeared designed to frustrate inquiry into IR's internal reporting methods. But if Mr. Weintraub is taken at his word, then IR's various divisions run themselves with little if any corporate involvement, but with an overall corporate blessing.

IR's argument, extended to its logical conclusion, is that doing nothing, but considering doing something, is enough to claim the company was not acting willfully or disregarding human safety. The Court finds this unpersuasive. If a company through its managers and officers can avoid a punitive damage award simply by saying "well, we thought about changing things but we decided those changes wouldn't work," then there will never be another punitive award in the history of products liability litigation. Nor will any company ever have to test, redesign, or recall a product. Thinking about, considering, or pondering doing something but then doing nothing is still *doing nothing*.

IR saw the recognized danger of an inboard pinchpoint—where the tire met the road—move "outboard" with its design change from a wheeled model to a track model milling machine in 1983. In 1985 IR heard from German customer Joachim Kobow that he felt the milling machine as it was being manufactured was too dangerous, and that he insisted on track guards, a chassis extension, and kill switches to reduce the dangers to his workers.

Over the 15 years that IR produced and sold the Model MT–6520 milling machine, IR product line manager Paul Willis testified that the company received numerous field reports from its service representatives, starting six months after the Model MT–6520 milling machine was placed on the market in 1983, about non-working or misadjusted backup alarms. Mr. Willis also identified photographs sent in by field reps that showed workers in extremely close proximity to the milling machine's tracks. He further testified that despite the fact that IR competitors such as CMI, Cedarapids, and Caterpillar used track guards, mirrors, and had designs that kept pinchpoints inboard, under the body of the machine, it was his feeling that such safety devices just wouldn't work; although he admitted that he had never tested his feelings. Mr. Willis testified that back in 1983, when IR decided to make a milling machine with tracks because the marketing department said there was more money to be made in track machines, he knew the company was creating a hazard putting the pinch-

point outside of the chassis, he knew people getting injured was always a possibility, and put the untested machine in the field—believing that field tests would give the company information on any other hazards that developed.

In early 1991, Mr. Martinelli went to a Coroner's Inquest in Canada after a road crewman was killed by an IR milling machine, where he heard alternative safety design suggestions. He testified that testing track guards and mirrors would be useless and a total waste of time. And then Cosandra Rogers lost her leg when it was entrapped by an IR milling machine.

For all the information the company was receiving, for all the information IR said it considered, reviewed, examined, and pondered—it did nothing.

Experts and company representatives alike testified that the machine was dangerous, that the pinchpoints were dangerous, that the blind spots were dangerous. IR's own expert, Dr. Walter S. Reed, testified that when a machine such as the MT–6520 has such a great potential for human harm, multiple safeguards against that harm are reasonable. Ms. Rogers' expert Dr. Vaughn Adams gave similar testimony.

Yet even after IR knew that the danger posed by the outboard pinchpoints of the MT–6520 was more than just theoretical, the company did nothing. It did not change its design. It did not add any guards. It did not test existing devices used by its competitors and installed on one of its own machines at the demand of a customer. It did not even send out a service bulletin or other notice to MT–6520 owners and users that the machine's dangers were real and serious.

As early as six months' after the MT–6520 was introduced, when the company began receiving reports from the field that out in the "real world," the milling machine's backup alarms were not working, they were sliding out of adjustment, the company did nothing. It did not test the alarm units as installed. It did not add inexpensive jam nuts or other fasteners to keep the alarm in proper operating condition. It did not alert owners and users to notify them of this

problem that posed a safety risk to those who work around the machine. The company did nothing.

Even after an October 1994 meeting of the individuals at IR who had been identified as having a role to play in addressing the growing milling machine injury problem, IR did nothing. But because the company thought about doing something, it argues, that was all it was legally obligated to do. The jury found otherwise.

Accordingly, the Court finds punitive damages were properly awarded, and declines to reduce or eliminate them.

**Outside of Rule 50's Renewed Motion**

IR points to several other items as requiring the Court to grant it judgment as a matter of law, or a new trial. Under Fed. R.Civ.P. Rule 50 and the law of this Circuit, because these matters were not cited with specificity in IR's motion before the verdict, the Court is not required to consider them now. But because the Court feels that IR's misstatements and sweeping conclusions should not go unaddressed, for the record it will respond to the issues in serial fashion:

**Admission of Videotape**

The Court admitted into evidence a videotape of the milling machine. This consisted of video of still photographs supplied to Ms. Rogers by IR; moving video of the milling machine also supplied by IR; moving video of a District Paving milling machine on the job in D.C. (although the jury was informed that the machine was not the one which had injured Ms. Rogers, that the work site was not the same one, but was a stretch of Connecticut Avenue at Calvert Street, and that the video was taken a week after Ms. Rogers was injured); and moving video taken from the operator's platform, looking into a convex mirror attached to the machine.

The entire videotape ran for nine minutes. Of that, the challenged shots of the District Paving machine comprised 3:35 seconds of the tape.

IR received a copy of this videotape during discovery in 1995, and received the final, edited version in February 1997 prior to the second deposition of Ms. Rogers' expert, Dr. Vaughn Adams—who used the tape to illustrate for the jury the basis for some of his opinions. No explanation has been offered as to why, then, IR waited until the moment when Ms. Rogers was introducing the tape into evidence to object to its contents and the manner in which they were assembled. IR had more than sufficient notice of the contents of the videotape, and ample opportunity to make its dissatisfaction known before trial, either during discovery or in the form of a motion in limine to the Court. Ms. Rogers' counsel, who taped the disputed shots himself, sought and received permission from his client to take the witness stand and testify as to the conditions under which he taped the District Paving machine. Counsel for IR, however, rejected the proffer by saying it would then seek to have Ms. Rogers' counsel disqualified from representing her further. The Court takes a dim view of these sort of tactics.

▮ Videotape evidence is categorized as photographic evidence under Federal Rule of Evidence 1001(2). So long as the scenes or events depicted accurately represent what they are alleged to portray, there is no requirement that the individual who actually took the pictures testify at trial to lay a proper foundation. *Simms v. Dixon,* 291 A.2d 184, 186 (D.C.App.1972).

▮ The jury was advised of the circumstances of the disputed shots: that they were not of the machine that injured Ms. Rogers although they were of another District Paving milling machine, that they were taken at another repaving site, and that they were taken one week after Ms. Rogers' accident by Ms. Rogers' counsel.

▮ Under Fed.R.Evid. Rule 403's prejudicial/probative balancing test, IR was not harmed, and the jury was greatly benefitted, by admitting the tape. This videotape was the only evidence offered the jurors that gave them an idea of what the milling machine looked and sounded like when it was operating. IR repeatedly argued that its designs were based on the "real world;" the tape demonstrated that. IR later directed the jury's attention to one of the shots in the videotape, saying that the milling machine's

backup alarm could be heard while the machine was going in reverse. IR cannot credibly claim it was prejudiced by the admission of evidence it subsequently argued to its own advantage.

■ "Photographs are admissible 'even when they contain points of difference between the time of taking and the time of the accident or injury, provided such differences are disclosed by the testimony and made clear to the jury.'" *Sinai v. Polinger Co.*, 498 A.2d 520, 532–3 (D.C.App.1985) (citing *Washington Coca Cola Bottling Works, Inc. v. Kelly*, 40 A.2d 85, 87 (D.C.1944)).

The jury was made aware of the "points of difference" between the videotape and the actual event: that the tape was taken at a different point in time and place than that of the incident that injured Ms. Rogers. Ms. Rogers' expert, Dr. Vaughn Adams, gave a running narration of the tape as it played, and testified that he assisted in its assembly. His testimony coincided with text that was superimposed briefly over the moving pictures. Given the information the jury was made aware of before and during the viewing of the videotape, the Court finds the tape was a sufficiently accurate representation of the machine in question.

### Expert Vaughn Adams' Testimony

IR argues that the testimony of Plaintiff's expert Vaughn P. Adams, Ph.D., is untested, unsubstantiated, and "junk science" of the type to be prohibited under Fed.R.Evid. 702 and the U.S. Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The *Daubert* standard as enunciated in *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C.Cir.1996) says that the Supreme Court wants trial courts to focus on two things: reliability and relevance. The trial judge acts as a 'gatekeeper,' by performing "a preliminary assessment of whether the reasoning or methodology underlying the testimony of scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" *Daubert* at 592–3, 113 S.Ct. at 2796. As gatekeeper, the District Court must keep its eye "solely on

principles and methodology, not on the conclusions that they generate" *Id.* at 595, 113 S.Ct. at 2797. The *Ambrosini* court noted that the phrase "scientific knowledge" was a key to determining the reliability of expert evidence, and that the words required that "an inference or assertion must be derived by the scientific method" (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795).

That method was outlined as being a flexible inquiry by the District Court into (1) whether the theory or technique can or has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the method's known or potential rate of error, and (4) whether the theory or technique finds general acceptance in the relevant scientific community. None of the four factors is seen as dispositive or exhaustive; the inquiry is a fluid one, where none of the factors is necessarily applicable in every case.

As to relevance under *Daubert*, the District Court is supposed to determine whether the proffered expert testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."

■ Dr. Adams' testimony was sufficiently tied to the facts of this case. His professional training and experience in safety engineering were not challenged at trial, nor were his methods. He testified that he had not worked on milling machines but had worked on other, similar road construction equipment in both operation and safety design capacities. He testified that he had at one time worked for a company that performed safety analyses—Failure Analysis Associates. This same firm was hired by IR to perform the only safety analysis ever done—of the wheeled version of its milling machine back in 1983. Dr. Adams' opinions on various alternative safety features and the feasibility of their design and application—especially as they were drawn from designs that actually exist on machines either made by IR competitors or from the MT–6520 milling machine IR outfitted for German client Joachim Kobow in 1985—were not based in fantasy or speculation, but on actual known applications. This showed Dr. Adams' theories can and have been tested, in the "real world."

**16**

The Court finds Dr. Adams' testimony both reliable and relevant under *Daubert,* and further finds that the proper weight his testimony and methods should be given was a question for the jury.

### Exclusion of William Anton's Testimony

Ms. Rogers argued that IR's witness William Anton and the results from his vibration tests on the milling machine back-up alarm system, which were concluded March 25, 1997, constituted "surprise evidence" which would have resulted in both "trial by ambush" and allowing IR to utilize Mr. Anton as an expert without having noticed or qualified him as one.

IR had 15 years from the time it first purchased the company that made prototypes of the MT–6520 until it sold its milling machine interests. During that period IR never conducted a vibration test of the type it proposed to introduce.

Less than two weeks before trial, IR notified Ms. Rogers of its intent to call Mr. Anton as a witness and use his just-completed test results during trial. This did not give Ms. Rogers' counsel time to depose Mr. Anton or to have Dr. Adams (or another expert) put Mr. Anton's results to any test.

A party has a continuing duty to supplement his or her response to discovery requests relating to expert witnesses to be called at trial in a reasonable and timely manner. The duty of supplementation may be enforced through sanctions imposed by the trial court, including exclusion of evidence, continuances, or other action deemed appropriate by the court. *See* Fed.R.Civ.P. 26(e), Advisory Committee Note.

■ A purported lay witness who will be called upon to explain testing methodology and its applied results is serving as an expert, whether he is called one or not, because he will be asked to draw inferences that the jury would not be able to cull from its collective ordinary experiences. Mr. Anton's curriculum vitae, reports, and information were not given to Ms. Rogers in the timely fashion required under Fed.R.Civ.P. 26, which was drafted in no small part to prevent tactics like this. Under the Federal

Rules, the Court had the discretion to disallow Mr. Anton's testimony.

This Circuit has stated "the qualification of a particular witness to testify as an expert is largely within the domain of the trial judge. Particular inquiries which may be appropriate in some cases may be inappropriate in others. The majority of this court think the matter should be left to the sound judicial discretion of the trial judge, with no more specific guidance than is contained in this opinion." *Beins v. United States,* 695 F.2d 591, 609 (D.C.Cir.1982) (quoting *Jenkins v. United States,* 307 F.2d 637, 645 (D.C.Cir. 1962) (en banc)).

### Joachim Kobow's Testimony

IR argues that it was error for the Court to allow Joachim Kobow to testify because his testimony had no probative value and was prejudicial to the company. The Court disagrees.

German road construction company owner Herr Joachim Kobow purchased an IR MT–6520 milling machine, modified to his specifications, in 1985. He testified on the fourth day of trial.

Herr Kobow, speaking through an interpreter, said that he first saw the IR milling machine at a BAUMA (road construction equipment trade show in Europe) conference. He said that his company uses several manufacturers' milling machines—half of them with tracks, the other half with wheels—and owns only the one IR milling machine he purchased in 1985.

■ Herr Kobow testified that when he visited IR's plant in Shippensburg, Pennsylvania in 1985, he saw the MT–6520 and decided to buy one. But there were changes he wanted made before he took delivery: he wanted coverings for the transport belt and tracks, kill switches, a box at the end that could prevent someone from being hit by the back of the machine, and rubber or plastic "grousers" (cross-pieces) on the tracks. Herr Kobow testified he had safety concerns when he saw the machine. He said that he wanted a box on the rear of the machine—extending the chassis—so that no one could run between the tracks in the back. He added that he wanted track covers on the

tracks so that nobody could step up to them and be injured. Herr Kobow said he spoke to IR about his concerns and that most of them were addressed in the modifications made at the Shippensburg plant. He identified Exhibit 47 a-e as photographs of his IR MT–6520 milling machine, and agreed that the photographs show the machine as it exists, with front and rear track guards, kill switches, and an extended chassis.

Given the District's adoption of the risk-utility analysis in *Warner Fruehauf v. Boston,* 654 A.2d 1272 (D.C.App.1995), the Court finds that Herr Kobow's testimony regarding his 1985 purchase of an IR milling machine fitted with track guards and other safety devices was admissible. This is especially so because it showed evidence of IR's notice of one party's worker safety concerns, the company's ability to easily address those concerns, and the feasibility of alternative designs for the milling machine.

**Negligence *Per Se***

■ IR claims that District Paving was negligent *per se* in operating the milling machine on April 17, 1992, without a working backup alarm. IR now points to the Occupational Safety and Health Act, 29 U.S.C. section 651, *et seq.*, and to *Weston v. WMATA,* 78 F.3d 682 (D.C.Cir.1996), for the proposition that violation of a statute or regulation designed to protect persons is negligence *per se.* While this may be the law, it does not comport with the facts in the case that were heard by this jury.

Cosandra Rogers testified she heard the milling machine's backup alarm once or twice earlier in the day on April 17, 1992, but not right before she was backed over. Charles Price, the milling foreman, said he had left the job site shortly before Ms. Rogers was injured, but that insofar as he knew, the backup alarm had been sounding earlier that day. David McDaniels, District Paving's chief mechanic, said all alarms were working the morning of Ms. Rogers' injury. Russell Harrison, another District Paving employee, said the backup alarm was not working at the time Ms. Rogers' was hurt. District Paving's safety director Roy Burke testified that while putting a machine without a working alarm would have been in contravention

of IR's operator's manual—and of the OSHA—there was nothing he knew of to indicate the District Paving milling machine had been put into service the morning of April 17, 1992, with a non-functioning or out of adjustment backup alarm.

There was no evidence, especially when viewed in a light most favorable to Ms. Rogers, as is required here, that the District Paving milling machine went into service that day with an inoperable backup alarm in violation of the OSHA or any other safety regulation. That an act or omission would have broken a law had it occurred does not prove that it did occur. What the testimony and evidence did highlight was that the IR backup alarm system, which was designed to be adjustable, frequently went "out of adjustment" and became either intermittently or completely inoperable at that point. It was also established that IR knew of the backup alarm's propensity to do this, but that the company never felt the need to either issue a technical bulletin or other communique to inform milling machine owners and/or operators that this was happening, or to take redesign measures to address the problem. IR stipulated that its operator's manual, which it issued when the milling machine was sold, similarly did not inform maintenance technicians how to readjust the backup alarm if it went out of adjustment.

A party is entitled to a jury instruction only if the claim is properly established and its basis appears in the evidence offered to and accepted by the Court. This was not a matter of whose testimony the jury might have chosen to believe; it is a case of a claim that was too attenuated from the circumstances and facts described in testimony, and not sufficiently established by the evidence presented. To have asked the jury to speculate on a claim not properly before it would have been both confusing and wrong.

**Evidence of Other Accidents**

Fed.R.Evid. 403 and its probative/prejudicial balancing test governs this issue. IR argues that evidence of other, similar incidents which injured (and in one case, killed) road crew workers is unfairly prejudicial and not probative.

■ Regarding the Ledgerwood accident evidence, while information about a repaving site fatality is certainly disturbing, IR cannot argue to exclude it solely because it is disturbing. The accident happened before Ms. Rogers' lost a limb to the same machine, and arguably put IR on notice of potential dangers to those who work with its milling machines, even if IR had not had such notice previously.

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C.Cir.1993), states that evidence of reasonably similar incidents is admissible at trial. In Ms. Rogers' case, the Ledgerwood incident (prior to Ms. Rogers' injury) was cited to show that IR was on notice that the milling machine as designed and manufactured had caused the ultimate injury: a fatality. The Court sharply limited reference to the Alexander and Madden incidents—injuries that occurred shortly after Ms. Rogers'. Those two incidents were part of an illustration drawn by IR's own Frank Martinelli and discussed at a meeting IR held in 1994, ostensibly to address milling machine injuries and safety devices the company could use to prevent them or reduce their likelihood. The drawing was received into evidence, and Mr. Martinelli and others from IR testified about both the drawing and the meeting. No details or evidence of Mr. Alexander's or Mr. Madden's injuries were given at trial. Under Rule 403's balancing test, the probative value to the jury—allowing it to make sense of the subject of the 1994 meeting and what the company was taking into its consideration—outweighed whatever minimal prejudice IR feels may have been generated by the jury hearing that two more individuals were harmed by the milling machine.

Also, IR's representation that evidence of the Smith injury was put before the jury is wrong. Nothing identifying Mr. Smith, or the fact that he, too, sustained a milling machine injury, was heard by the jury. A tape prepared by an expert for Mr. Smith's trial was identified by an IR employee, but the line of questioning was quickly dropped when the Court sustained IR's objection for lack of foundation.

**Standard: Motion for a New Trial**

Rule 59(a), Fed.R.Civ.P.., provides in part that: (a) new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted at law in the courts of the United States. The disposition of such a motion is a matter entrusted to the sound discretion of the trial court. *Grogan v. General Maintenance Service Co.*, 763 F.2d 444, 448 (D.C.Cir.1985), citing *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980); *Taylor v. Washington Terminal Co.*, 409 F.2d 145, 148 (D.C.Cir.), cert. denied, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

The Court finds that the jury reasonably credited the testimony and evidence as presented, and that the testimony and evidence were sufficient to sustain a verdict for Ms. Rogers and against IR as to liability for her claims of strict liability and/or negligence. The Court also finds that the jury could reasonably credit the testimony and evidence to find sufficient reckless disregard for human safety on the part of IR for a proper award of punitive damages. The Court, therefore, will not usurp the province of the jury, and denies IR's renewed motion for judgment as a matter of law, or for a new trial.

**Conclusion**

For the above-stated reasons, the Court finds the jury acted within its province in reaching a verdict awarding Plaintiff Cosandra Rogers $10,200,000.00 in compensatory damages and $6,500,000.00, and affirms the jury's award and the judgment entered against IR. An appropriate Order is attached.

**ORDER**

This matter is before the Court on Ingersoll–Rand's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial, and Cosandra Rogers' opposition thereto. Upon consideration of the motions of the parties, the record of the case, and for the reasons set out in the

attached Memorandum, it is by the Court this 15th day of July, 1997,

**ORDERED** that the Defendant's Motion is **DENIED;** and it is further

**ORDERED** that judgment for the Plaintiff is **REAFFIRMED;** and it is further

**ORDERED** that Ms. Rogers' July 3, 1997, Motion for Leave to File Supplemental Points and Authorities is **DENIED** as moot.