Lamont MITCHELL, et al., Plaintiffs,

v.

DCX, INC. d/b/a Diamond Cab Company of D.C., et al., Defendants.

No. CIV.A.00–1317 (RWR).

United States District Court, District of Columbia.

July 22, 2003.

Roderic VonOesen Boggs, Reed N. Colfax, Washington Lawyers' Committee, Peter Bushfield Work, Crowell & Moring, L.L.P., Washington, DC, for plaintiffs.

Joel S. Aronson, Ridberg, Press & Sherbill, L.L.P., Bethesda, MD, for defendants.

Karl Rudder, Takoma, MD, pro se.

## MEMORANDUM OPINION AND ORDER

ROBERTS, District Judge.

Plaintiffs, Lamont Mitchell, Viola Bowen and the Equal Rights Center ("ERC"), have filed a seven-count complaint alleging that DCX, Inc. d/b/a Diamond Cab Company of D.C. ("Diamond") failed to dispatch cabs in response to requests from Mitchell and Bowen for service because the requests were for service in the predominantly African–American Southeast quadrant of the District of Columbia ("Southeast"). Plaintiffs further allege that the experience Mitchell and Bowen had reflects Diamond's pattern and practice of not providing cab service to Southeast. Diamond has moved for summary judgment on all counts, and plaintiffs have cross-moved for summary judgment on the counts alleging violations of the D.C. Human Rights Act ("DCHRA"). Because defendants have not rebutted plaintiffs' prima facie cases of discrimination in violation of the DCHRA, plaintiffs' motion for summary judgment will be granted as to Counts II and III. Because plaintiffs are not contesting Diamond's motion for summary judgment on their fraudulent misrepresentation and intentional infliction of emotional distress claims, Diamond's motion for summary judgment will be granted with respect to Counts VI and VII. Because no genuine issues of material fact exist with respect to plaintiffs' claim of

breach of common carrier duties and Diamond is entitled to judgment as a matter of law, Diamond's motion for summary judgment will be granted with respect to Count IV. Because genuine issues of material fact exist with respect to the remaining counts, Diamond's motion for summary judgment will be denied as to all of the remaining counts.

## BACKGROUND

Diamond is not in the business of owning or operating cabs. (Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") at 16.) Instead, it rents to cabs "the right to use its color and scheme insignia." (*Id.*) At any given time, 260 to 270 drivers are renting the right to use Diamond's color and scheme insignia. (*Id.* at 2.) In addition to renting its name and emblem, Diamond also notifies cab drivers who rent from Diamond about individuals who have called Diamond seeking cab service. Operators at Diamond receive requests for service from potential customers and write these requests on call slips so that a dispatcher can announce the request to drivers in Diamond cabs. (*Id.* at 3.)

Whether dispatchers broadcast all requests in the same manner and what effect, if any, the service address has on how calls are broadcast are issues that are contested by the parties. Diamond argues that it treats all requests for cab service the same, regardless of the address for which service is requested. (*Id.*) Plaintiffs argue that Diamond's treatment of calls from Southeast,[1] which they claim is 96.3%

black, differs markedly from its treatment of calls for service in the Northwest quadrant of Washington, D.C. ("Northwest"), which they claim is 38.2% black. (Pl.'s Opp'n to Def. DCX, Inc.'s Mot. for Summ. J. and Mem. in Supp. of Pl.'s Cross Mot. for Summ. J. ("Pl.'s Mem.") at 6.)

On May 19, 2000, Mitchell, an African-American resident of Anacostia, called Diamond's dispatching service and requested that a cab take him to work in the downtown area of the District of Columbia. (*Id.* at 4.) It is undisputed that the operator told Mitchell that Diamond would not provide him the requested cab service, suggested that he try another cab company, and abruptly terminated the call. (*Id.*) Mitchell was not offered any justification for why Diamond would not provide cab service to him. After Diamond terminated the first call, Mitchell immediately called back, identified himself as the person who had just called and again requested a cab to come to his home in Anacostia. During this call the operator promised Mitchell that a cab would pick him up within 10 to 15 minutes. Mitchell waited an hour and a half for that cab. It is undisputed that no Diamond cab arrived at Mitchell's home and that no Diamond operator called Mitchell to inform him that a cab would not be coming. (*Id.*)

On May 23, 2000, Bowen, an African-American resident of Anacostia, called Diamond's dispatch service and requested that a cab pick her up and take her from her home to a department store in the downtown area of the District of Columbia. (*Id.* at 5.) The operator informed Bowen

---

1. It is unclear from plaintiffs' complaint and briefing whether plaintiffs are arguing that Diamond discriminates against callers from all Southeast service addresses or just those from the part of Southeast east of the Anacostia River, an area that will be referred to as "Anacostia." The distinction is irrelevant for purposes of this case, however, since both individual plaintiffs reside in Anacostia and the evidence offered by them addresses alleged discrimination by Diamond against residents of Anacostia. Although plaintiffs failed to identify the portion of Southeast in which Bowen resides, I will take judicial notice of the fact that the address offered for Bowen is located in Anacostia. Fed.R.Evid. 201(b).

that no Diamond cabs were in her area and suggested that Bowen seek service from another cab company because it would be thirty to forty minutes until a Diamond cab could arrive at Bowen's home. (*Id.*) Bowen informed the operator that she wanted a Diamond cab and was willing to wait. It is undisputed that Bowen waited for a Diamond cab for approximately an hour and a half, that no Diamond cab came to Bowen's home, and that no Diamond operator called Bowen to let her know that she would not be provided service. (*Id.*)

## DISCUSSION

Diamond has moved for summary judgment on all counts on several grounds, and plaintiffs have cross-moved for summary judgment on their two counts brought under the DCHRA. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"In considering a motion for summary judgment, all evidence and inferences must be viewed in a light most favorable to the non-moving party." *Hastie v. Henderson,* 121 F.Supp.2d 72, 77 (D.D.C.2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. The non-moving party is 'required to provide evidence that would permit a reasonable jury to find' in its favor." *Devera v. Adams,* 874 F.Supp. 17, 20 (D.D.C.1995) (quoting *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir. 1987)) (citations omitted). The court may consider any evidence that would be admissible at trial. *Kendrick v. Sullivan,* 766 F.Supp. 1180, 1192 (D.D.C.1991); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2721 (3d ed.1998).

Additional considerations exist when a party seeks summary judgment in a discrimination case. "Summary judgment is appropriate in a discrimination case 'where either the evidence is insufficient to establish a *prima facie* case, . . . or, assuming a *prima facie* case, there is no genuine issue of material fact that the defendant's articulated nondiscriminatory reasons for the challenged decision is pretextual.'" *Johnson v. Securiguard, Inc.,* No. Civ. A. 98–2381, 2000 WL 862643, at *3 (D.D.C.2000) (quoting *Paul v. Fed. Nat'l Mortgage Ass'n,* 697 F.Supp. 547, 553 (D.D.C.1988)). Where discriminatory intent and disparate treatment are at issue, courts should be cautious in granting summary judgment, because questions of intent and disparate treatment are difficult questions of fact often left to the jury. *See id.; Hastie,* 121 F.Supp.2d at 77. If, however, a plaintiff relies on purely conclusory allegations of discrimination, then summary judgment would be appropriate. *See Johnson,* 2000 WL 862643 at *3.

### I. Admissibility of Plaintiffs' Evidence

Diamond claims that certain evidence advanced by plaintiffs is inadmissible and cannot be considered in assessing the cross-motions for summary judgment. Plaintiffs have offered five different types of evidence in opposition to Diamond's mo-

tion for summary judgment and in support of their cross-motion. First, the plaintiffs have provided the statistical analysis of Dr. John J. Miller whose three reports that analyze Diamond's call slips conclude that Diamond provides disparate service to Anacostia. (Pls.' Mem. Exs. 9, 12.) Second, plaintiffs have offered former employees' anecdotal accounts of the disparate service allegedly provided to Anacostia by Diamond. (*Id.* Exs. 5, 6.) Third, plaintiffs have provided evidence of paired testing that allegedly shows that Diamond provides lesser service to Anacostia. (*Id.* Exs. 13, 14.) Fourth, plaintiffs discuss internal Diamond documents that allegedly reflect Diamond's intent to provide lesser service to Anacostia. (*Id.* at 9.) These documents include the handbook of maps with which Diamond provides cab drivers whose cabs bear its emblem. This handbook does not contain maps of Anacostia. (*Id.* Ex. 7.) The Diamond documents also include Diamond's consolidated financial statement, which states that Diamond is "a taxicab company serving primarily northwest Washington, D.C." (*Id.* Ex. 8.) Finally, the plaintiffs offer the two individual plaintiffs' accounts of their attempt to have a Diamond cab dispatched to their respective homes. (*Id.* at 4–5.) Diamond challenges the admissibility of the statistical evidence, the anecdotal evidence of Diamond's former employees and the tester evidence.

## A. STATISTICAL EVIDENCE

In Dr. Miller's supplementary report,[2] he randomly selected dates that post-dated the filing of the complaint[3] and compared the pick up rates for call slips from Anacostia on those days with the pick up rate for call slips from all other portions of the District. (*Id.* Ex. 9 at B1.) Based on this analysis, Dr. Miller determined that the pick up rate for all the areas other than Anacostia was 2.6 times greater than the pick up rate for Anacostia. Dr. Miller concluded that the number of standard deviations for this difference would be 21.6.[4] (*Id.*)

Diamond argues that the supplementary report is meaningless because Dr. Miller failed to control for factors having nothing to do with the racial composition of Ana-

---

**2.** Dr. Miller filed an initial report in which he reported that he randomly selected 28 days to analyze, but that the data for several of these dates was not ready at the time of his report. Therefore, he issued an initial report that contained analysis of the dates for which he had complete information and then supplemented this report with analysis of the dates not analyzed in the initial report. In the supplementary report, he also combined the data from the individual days analyzed in each report to reach conclusions reflecting all dates analyzed in both reports. (*Id.* Ex. 9 at B1.)

**3.** Because Diamond, in the normal course of business, destroys call slips after thirty days, call slips that predated the filing of the complaint had been destroyed by the time discovery began in this matter. (Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Reply") at 10.)

**4.** In statistical analysis, one tests a null hypothesis with an alternative hypothesis. Here, the null hypothesis is that Diamond and its cabs responded to call slips in an address-neutral manner. The alternative hypothesis would be that pick up rates will reflect that Diamond responds to call slips in some way related to address. In order to test the alternative hypothesis, an actual data set must be compared against a hypothetical data set in which pick ups are address neutral. Once the data sets are compiled and the pick up rates for both are determined, the statistical question becomes whether the actual data set is consistent with the null hypothesis of address-neutral pick ups, i.e., whether the difference between the pick up rates "could have occurred via chance variation out of an address-neutral fare pick up method." A difference of more than two standard deviations is often viewed as statistically significant. (Pls.' Mem. Ex. 9 at A2–A3.)

costia in determining whether a statistically significant difference existed between pick up rates for Anacostia and the rest of the city. (Def. Mem. at 13–14.) Diamond's expert, Dr. Hans Engler, identified three factors—proximity to downtown, percent of the population who commute by cab, and crime—that could arguably account for the different pick up rates. (Pls.' Mem. Ex. 10 at 3–4.) Dr. Engler, however, did not conduct his own study to determine that these factors *did* account for the different pick up rates. Instead, he showed that all of these factors had some effect on the odds of a successful pick up occurring.

While Dr. Engler also critiqued how Dr. Miller analyzed the call slip data, Dr. Engler's overall conclusion was that "the sampling plan was done in a professional and careful manner." (*Id.* Ex. 10 at 2.) Furthermore, Dr. Engler admitted that even after accounting for the mistakes he believes Dr. Miller to have committed in analyzing the call slips, Dr. Miller's conclusion that Anacostia received worse service than the rest of the District "continue[s] to have strong statistical support." (*Id.* Ex. 10 at 7.) When asked in his deposition if he had an opinion as to the cause of the different pick up rates between Anacostia and the rest of the city, he stated, "I don't have an opinion about the cause. I have several factors which are likely—could be good suspects, let's put it that way." (Pls.' Reply in Supp. of Their Cross–Mot. for Summ. J. on Counts II and III ("Pl.'s Reply") Ex. 1 at 77.)

Diamond has never explicitly requested that Dr. Miller's evidence be excluded under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[5] Diamond's criticism of Dr. Miller's report, however, suggests that Diamond believes the supplementary report could not withstand *Daubert* scrutiny because Dr. Miller failed to control for the factors identified by Dr. Engler.

To the extent Diamond sought to have Dr. Miller's report stricken under *Daubert,* the issue has now been mooted. In response to Dr. Engler's critique, plaintiffs had Dr. Miller issue a second supplementary report controlling for the three factors. While the additional factors reduced the statistical significance, Dr. Miller concluded that the standard deviation measure was still 14.7. (Pls.' Mem. Ex. 12 at 1.) Diamond has not challenged the substance of Dr. Miller's second supplementary report.[6] Accordingly, it will be considered for summary judgment purposes.

---

**5.** *Daubert* requires that when a trial judge is faced "with a proffer of expert testimony [he or she] must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786 (footnote omitted). The *Daubert* test reflects the principles in Federal Rule of Evidence 702. The Supreme Court suggested that courts look to four factors to determine whether the proffered testimony is based on scientific knowledge. The four factors are: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." *Ambrosini v. Labarraque,* 101 F.3d 129, 134 (D.C.Cir.1996) (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

**6.** Diamond did challenge the timeliness of Dr. Miller's second supplementary report arguing that the report was filed after the scheduling order's deadline for the filing of expert reports. (Def.'s Reply at 8–9.) Because Diamond believed the report to be late, it moved to strike the report. In an order signed March 18, 2002, this Court denied Diamond's motion to strike Dr. Miller's second supplementary report, but gave Diamond additional time in which to depose Miller and to file supplemental briefing regarding that deposi-

## B. ANECDOTAL EVIDENCE OF FORMER EMPLOYEES

In support of their opposition to defendant's motion for summary judgment and their cross-motion for summary judgment, plaintiffs offer the declarations of two former Diamond operators, Monique Watson and Sherronda Tibbs. Watson's declaration states that she often heard dispatchers announcing requests for service from Southeast differently than requests for service from Northwest; that dispatchers would often throw out call slips for Southeast if a cab did not immediately respond to the first call for service; and that dispatchers would often pressure cabs into responding to calls from Northwest, but not to calls from Southeast. (*Id.* Ex. 5 at 3–4.) Tibbs declaration states that in her experience dispatchers rarely followed standard procedures in handling requests for service from Southeast; that dispatchers would frequently not even announce requests from Southeast—particularly requests from Anacostia; and that when she received follow-up calls from customers in Southeast, dispatchers would tell her to tell the caller that Diamond was still working on securing a cab, when, in fact, they were not. (*Id.* Ex. 6 at 3–4.) Diamond objects to the use of this evidence arguing that it is all hearsay.

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Thus, a hearsay statement must contain an assertion of fact that is offered to establish the truth of the fact asserted. Where a declaration is offered to prove that words were said, rather than to prove the truth of those words, a hearsay objection is not proper. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 173 n. 18, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)

(noting that a hearsay objection would have been unavailing where a declaration was not offered to prove the truth of the matter asserted, but was instead offered simply to prove what an out of court declarant had previously said about an accident).

Here, the declarations by Watson and Tibbs do not present hearsay concerns. First, many parts of the declarations, such as accounts of dispatchers throwing out call slips and dispatchers not announcing requests for service from Southeast, are actions, or inaction, observed by the witnesses, not statements by the dispatchers. Second, the few statements referenced in the declarations, such as the dispatchers directing Tibbs to inform callers from Southeast that Diamond was still working on their request for a cab, are not assertions of fact containing some truth component. They are directives, or verbal acts, being offered to show that the dispatcher stated the words, not that Diamond was actually working on honoring the request. Indeed, Tibbs made quite clear that Diamond was not working on providing cab service. The declarations by Watson and Tibbs, then, do not contain inadmissible hearsay.

## C. TESTER EVIDENCE

The ERC organized a "study" in which testers were sent to different parts of Southeast and Northwest to request service from Diamond. (Pls.' Mem. at 14–15.) The study purports to show that all twelve of the testers who placed calls from Northwest received service, whereas only one of the twelve testers from Southeast received service. Diamond argues the study cannot withstand *Daubert* analysis and should not be considered for purposes of summary judgment.

tion. Diamond elected to not file any supplemental briefing.

Plaintiffs counter that tester evidence has been frequently used in cases without being subject to *Daubert.* This assertion, while true, does not address Diamond's challenge. Where a party wishes to use tester data to support a theory of liability, a trial judge must fulfill his *Daubert* gatekeeper role under Rule 702. *See Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Estate, Co.,* 130 F.Supp.2d 1074, 1081 & n. 12 (E.D.Mo.2001) (holding that tester data was subject to *Daubert* analysis where tester evidence was the primary source of liability in a case brought under the Fair Housing Act, 42 U.S.C. § 3601).

The plaintiffs' submissions make clear in several ways that the tester data is offered as statistical evidence, not anecdotal evidence. First, plaintiffs have presented the testers' experience through the deposition testimony of the person who organized the testers, not anecdotally through the testers' declarations.[7] Second, plaintiffs have identified ERC's use of testers as "a study of taxicab service in the District of Columbia . . . ." (Compl.¶ 18.) Finally, relying on the "study," plaintiffs conclude that "before the lawsuit started, residents of Northwest received service 100% of the time, whereas residents of Anacostia received service just 8% of the time." (Pls.' Mem. at 22.) Plaintiffs must satisfy *Daubert* before offering such statistical conclusions. Accordingly, plaintiffs'

statistical evidence through tester data will not be considered for purposes of summary judgment.[8]

## II. *Diamond's Liability*

Diamond has moved for summary judgment on all seven counts. It argues that even if any conduct that gives rise to these causes of action occurred, Diamond cannot be held liable because the conduct is attributable to its cab drivers, who are independent contractors.

Diamond's argument fails for two, independent reasons. First, plaintiffs are not simply arguing that cab drivers who bear Diamond's emblem are responsible for the disparate pickup rates and the inability of Mitchell and Bowen to get service from Diamond in Anacostia. Instead, plaintiffs, using the testimony of former employees of Diamond and internal Diamond documents, argue that Diamond's dispatchers and managers engage in conduct that contributes to the lower pickup rate for Anacostia. (Pl.'s Mem. at 6–10.) Diamond, of course, does not argue that it would not be liable for the tortious and discriminatory conduct of its dispatchers and managers.

Second, Diamond would be liable for any tortious or discriminatory acts committed by cab drivers bearing Diamond's emblem against prospective passengers. "[T]he law in the District of Columbia is that a taxicab company is estopped as a matter of law to deny vicari-

---

7. The deposition testimony of the organizer of the study, Sonya Gutierrez, contains numerous hearsay accounts of various testers' attempts at securing service from Diamond. (Pls.' Mem. Ex. 14 at 59–69.) Pursuant to Fed. Evid. R. 703, an expert would be able to rely on such information and incorporate it in reaching her conclusions if the "study" satisfied *Daubert* and tester accounts are normally relied upon in statistical analysis. Without Rule 703, however, Gutierrez's testimony recounting the testers' out of court statements to establish their experiences with Diamond

are all hearsay, and plaintiffs have not identified any hearsay exception that would allow for their admission. Accordingly, it is apparent that plaintiffs seek to introduce the summaries of the testers' statements pursuant to Rule 703.

8. Plaintiffs would not be precluded from offering the testers' anecdotal evidence at trial in a manner consistent with the Federal Rules of Evidence.

ous liability when one of its drivers injures a passenger and the taxicab, regardless of who owns it, bears the company's colors and markings." *Floyd–Mayers v. Am. Cab Co.*, 732 F.Supp. 243, 245 (D.D.C. 1990). Where a passenger claims to have been injured by a cab driver, "proof of a traditional employer-employee relationship is unnecessary, because the relationship prong of the *respondeat superior* doctrine is satisfied as a matter of law in this case[.]" *Id.; see also Tarman v. Southard*, 205 F.2d 705, 706 (D.C.Cir.1953) (holding that "[w]hen a company's insignia on a cab suggest ownership and consequent responsibility, it is estopped as against a passenger to deny responsibility"); *Wood v. Barwood Cab Co.*, 648 A.2d 670, 671 (D.C.1994) (noting that "a taxicab company is estopped from denying liability for a driver's negligence on the ground that it did not own the vehicle—but only if the injured person was a passenger in the taxi driven by the allegedly negligent driver").[9] Where the plaintiff is a passenger, cab companies are not only liable for the torts committed by cab drivers who bear the cab company's emblem, but they are also liable for any acts of discrimination committed by these cab drivers. *See Floyd–Mayers*, 732 F.Supp. at 246 (holding that cab company can be held vicariously liable for the intentional acts of racial discrimination by cab drivers bearing the company's emblem). All of these protections for passengers extend to prospective passengers as well. *Id.*

Diamond would be liable not only for the discriminatory and tortious acts of its managers and dispatchers, but also for those cab drivers who discriminate against passengers or prospective passengers. Accordingly, Diamond's argument that even if any wrongdoing occurred, it cannot be held liable, will be rejected as to all of plaintiffs' causes of action.

## III. *Sufficiency of Plaintiffs' Evidence*

Diamond also challenges the sufficiency of plaintiffs' evidence on each count.

### A. § 1981 (COUNT I)

 Plaintiffs allege that Diamond has violated the right of Mitchell, Bowen and other residents of Southeast to make contracts under 42 U.S.C. § 1981 (West 2000).[10] Section 1981 claims most commonly involve contracts of employment, but § 1981 also prohibits refusal of service based on race. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996). "To establish a claim under § 1981, a plaintiff must show that (1) [he or she is a member] of a racial minority [group]; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities

---

**9.** In its motion for summary judgment, Diamond has greatly confused the rules for cab company liability, arguing that only a "bursting bubble" presumption exists that a cab driver is "an agent acting within the scope of employment of the company whose name appears on the cab" and that the evidence in this case shows that cab drivers are not Diamond's employees. (Def.'s Mem. at 17.) This rebuttable presumption analysis, however, is used in cases in which the injured party is not a passenger or prospective passenger. *See Wood*, 648 A.2d at 671 (explaining how the rules for liability for passengers and prospective passengers differ from the rules of liabili-ty for those who are not seeking to secure the services of the cab drivers who injure them).

**10.** 42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

enumerated in the statute." *Id.* Because a plaintiff must show discriminatory intent, a showing that a racially neutral policy had a disparate racial impact will not be enough; a plaintiff must show that a defendant intentionally treated him or her differently because of his or her race. *See Krodel v. Young,* 748 F.2d 701, 709 (D.C.Cir.1984) (explaining that the major difference between disparate impact cases and disparate treatment cases is that disparate impact cases do not require a showing of intent, whereas disparate treatment cases do).

The allocation of burdens in a § 1981 case is governed by the burden-shifting analysis created by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superseded in part by* The Civil Rights Act of 1991. Accordingly, the plaintiffs bear the burden of proving a prima facie case of discrimination. If the plaintiffs prove such a case, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for the lack of service. Should the defendant state such a reason, the plaintiffs must be given the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Here, Diamond does not contest that Mitchell and Bowen are members of a racial minority group or that cab service is covered by § 1981. Instead, Diamond argues that plaintiffs have no evidence that addresses Diamond's discriminatory intent and that any evidence of disparate treatment shows, at most, that Diamond provides different service to different parts of the city.

It is well established in this circuit that plaintiffs can use statistical evidence to establish the type of intentional discrimination that is necessary to prove a disparate treatment case or to argue that the non-discriminatory reason offered by the defendant is pretextual. *See Forman v. Small,* 271 F.3d 285, 292 (D.C.Cir.2001) (noting in case involving discrimination claim requiring proof of intent that "[t]his circuit recognizes statistical data as relevant in individual discrimination claims"); *Anderson v. Zubieta,* 180 F.3d 329, 341 (D.C.Cir.1999) (noting that "[t]his court has squarely held that, even absent specific anecdotal evidence of discrimination, statistical proof alone may establish a prima facie case of *intentional* discrimination") (quoting *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1413 (D.C.Cir.1988) (emphasis in original)); *Minority Employees at NASA v. Beggs,* 723 F.2d 958, 962 (D.C.Cir.1983) (explaining in case involving discrimination claim requiring proof of intent that "[i]t is well established that statistical data and comparative information concerning [a defendant's] treatment of minorities is relevant evidence in an individual discrimination claim against that [defendant]. Such evidence can be used by a plaintiff to make out a *prima facie* case of discrimination or to show that the employer's stated reasons for the challenged actions are a pretext for discrimination").

A statistical disparity, however, is not, in and of itself, probative of discriminatory intent unless it is statistically significant. A disparity alone is not enough because disparate treatment can have three possible causes: 1) discriminatory animus; 2) a legitimate, nondiscriminatory cause; or 3) random chance. *See Palmer v. Shultz,* 815 F.2d 84, 90–91

(D.C.Cir.1987). The *McDonnell Douglas* burden-shifting analysis ensures that § 1981 liability will not lie where the statistical disparity is caused by a legitimate, non-discriminatory cause. Requiring statistical significance ensures that § 1981 liability will not lie where the statistical disparity is caused by random chance. The D.C. Circuit has held that a statistical disparity measuring 1.96 standard deviations or greater is statistically significant enough that the disparity alone can establish a *prima facie* case of discrimination. *See Palmer*, 815 F.2d at 90–91.

■ Another well-established principle of § 1981 law is that a defendant violates § 1981 by denying one of the activities enumerated in the statute to an area or community based upon the racial composition of that area or community. This principle has been oft repeated in housing discrimination cases alleging violations of § 1981. *See Latimore v. Citibank, F.S.B.*, 979 F.Supp. 662, 662–65 (N.D.Ill.1997) (explaining that in order to withstand summary judgment, plaintiff, an African-American resident of a neighborhood that was over 90% African-American, could state a § 1981 claim of discrimination either by showing that defendants "treated her materially differently than similarly situated white loan applicants or [that they treated her differently from similarly situated] loan applicants from non-minority neighborhoods"); *Doane v. Nat'l Westminster Bank USA*, 938 F.Supp. 149, 149–153 (E.D.N.Y.1996) (holding that white owner of a home in a neighborhood that was 92.56% African-American stated a *prima facie* case under § 1981 by alleging that despite being creditworthy and having an independent appraisal stating that the value of the house equaled the sale price, people interested in purchasing his home had their mortgage applications denied); *Old West End Assoc. v. Buckeye Fed. Sav.*

*& Loan,* 675 F.Supp. 1100 (N.D.Ohio 1987) (holding that white plaintiffs stated *prima facie* case under § 1981 by alleging that despite being creditworthy and having an independent appraisal stating that the value of the house equaled the sale price, the buyers' loan application was denied for a home in a minority neighborhood).

Another example of this principle is provided in *Buchanan v. Consolidated Stores Corp.*, where the court held that plaintiffs, who alleged that the defendant accepted checks to pay for merchandise in its stores in predominantly white neighborhoods, but would not accept checks to pay for merchandise in its stores in predominantly African-American neighborhoods, stated a *prima facie* claim of intentional discrimination under § 1981. 125 F.Supp.2d 730, 732–35 (D.Md.2001).

■ Here, the plaintiffs have presented largely unrebutted statistical evidence of the difference between Diamond's pickup rate for Anacostia and its pickup rate for the rest of the District. Even after accounting for Dr. Engler's possible, non-discriminatory causes for the difference in pick up rates, Dr. Miller concluded that the number of standard deviations for the difference in pickup rates was 14.7. (Pl.'s Mem. Ex. 12 at 5.) The standard deviation measure of 14.7 dwarfs the 1.96 standard deviation requirement articulated by this circuit. Indeed, defendant's expert, even after adjusting for errors he believed Dr. Miller to have committed, stated that Dr. Miller's conclusion that Anacostia received worse service than the rest of the District "continue[s] to have strong statistical support." (*Id.* Ex. 10 at 7.) Diamond has not challenged the conclusions of Dr. Miller's second supplementary report.

In addition to this statistical evidence, Diamond has provided declarations from former employees who both have stated that Diamond did not follow its standard

procedures for announcing requests for service when requests were made for service in Southeast—particularly where the requests came from Anacostia. (*Id.* Exs. 5 at 3, 4; 6 at 3–4.)

Finally, Mitchell and Bowen's accounts of their attempt to secure cab service from Diamond is consistent with both the statistical and the anecdotal evidence presented by the plaintiffs. The statistical evidence suggests that as residents of Anacostia, the likelihood of their getting picked up by a Diamond cab is much smaller than the likelihood of getting picked up in another part of the city. Plaintiffs' anecdotal evidence also suggests that Mitchell and Bowen's likelihood of getting picked up was not that great. Furthermore, the anecdotal evidence of operators informing callers from Anacostia that a cab would be coming when, in fact, the dispatchers were not attempting to obtain a cab for them, is also consistent with Mitchell and Bowen's accounts.

Plaintiffs have presented disputed issues of material fact about whether Diamond intentionally provided lesser service to an area of the District that was disproportionately African–American. Because genuine issues of material fact exist on the § 1981 claim, summary judgment would be inappropriate, particularly since liability would turn on the discriminatory intent of the defendant. *See Hastie,* 121 F.Supp.2d at 77. Accordingly, Diamond's motion for summary judgment on the § 1981 claim will be denied.

**B. RACE DISCRIMINATION IN VIOLATION OF THE DCHRA (COUNT II)**

Plaintiffs allege that defendants have violated their rights under D.C.Code § 2–1402.31 (2001),[11] which makes it an unlawful discriminatory practice "[t]o deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" on the basis of race. The Effects Clause of the DCHRA adds that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C.Code § 2–1402.68 (2001).[12] Diamond argues that it is entitled to summary judgment because the plaintiffs have not presented any evidence that could support a finding of intentional racial discrimination on the part of Diamond. Plaintiffs argue that they are entitled to summary judgment because they have shown that the manner in which Diamond responds to requests for cab service has a discriminatory effect and that Diamond has not offered any business necessity that would justify this disparate impact.

Citing the Effects Clause, the District of Columbia Court of Appeals has held that "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 29 (D.C.1987); *see also Ramirez v. District of Columbia,* No. 99–803(TFH), 2000 WL 517758 (D.D.C.2000) (holding that "the effects clause of the DCHRA prohibits unintentional discrimination as well as intentional").[13]

---

11. When the complaint was initially filed, this provision was codified at D.C.Code § 1–2519 (1981).

12. When the complaint was initially filed, this provision was codified at D.C.Code § 1–2532 (1981).

13. Diamond's argument that a showing of intentional discrimination is necessary under

■ Once a plaintiff establishes that a business practice has a discriminatory effect, a defendant can defend against liability by showing that one of the exceptions to the DCHRA justifies the discriminatory effect. *See, e.g., Doe v. District of Columbia Comm'n on Human Rights,* 624 A.2d 440, 446 (D.C.1993) (explaining that discrimination will not establish liability under the DCHRA if the defendant can show the discrimination is justified by business necessity). Of the exceptions codified at D.C.Code § 2–1401.03, only the business necessity exception could be applicable here. That exception states that "[a]ny practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity." D.C.Code § 2–1401.03.

■ The business necessity exception "requires a good deal more than 'mere "difficulty" in conducting a business by non-discriminatory means.'" *Natural Motion by Sandra, Inc. v. District of Columbia Comm'n on Human Rights,* 687 A.2d 215, 218 (D.C.1997) (quoting *Joel Truitt Mgmt., Inc. v. District of Columbia Comm'n on Human Rights,* 646 A.2d 1007, 1009 (D.C.1994)). A defendant must show that without the business necessity exception, the defendant's business could not be conducted. *See Truitt Mgmt.,* 646 A.2d at 1009. Where a defendant fails to show a business necessity, judgment for the plaintiff is appropriate. *See Doe,* 624 A.2d at 446 (D.C.1993) (noting that where the defendant failed to offer a business necessity for a discriminatory act, judgment was entered in the plaintiff's favor).

■ Here, Dr. Miller's first supplementary report concluded that the pickup rate for all portions of the District other than Anacostia was 2.6 times larger than the pickup rate for Anacostia and that the number of standard deviations representing the difference is 21.6. (Pls.' Mem. Ex 9 at B6.) Further, plaintiffs' representation that African–Americans constitute only 60% of the population of the District but 96% of the population of Anacostia is also uncontroverted. (*Id.* at 29.) Accordingly, Diamond's business practice of picking up passengers from Anacostia at a lower rate than it does from the rest of the District bears disproportionately on African–Americans.

■ Under the DCHRA, once the plaintiffs establish that Diamond had a practice of picking up passengers at a different rate from Anacostia and that that practice disproportionately affected African–Americans, the burden shifts to Dia-

the DCHRA is fatally flawed for two reasons. First, Diamond simply ignores these cases that directly state that intentional discrimination need not be proven under the DCHRA. Second, Diamond cites a series of District of Columbia Court of Appeals cases stating that where appropriate, courts should look to federal civil rights law to interpret the DCHRA to support the proposition that the protections of the DCHRA are identical to the protections afforded by federal civil rights law. (Def. Mem. at 17–19). *See, e.g., Daka, Inc. v. Breiner,* 711 A.2d 86, 92 n. 14 (D.C.1998) (explaining that the D.C. Court of Appeals "has 'often looked to cases construing Title VII to aid ... in construing the D.C. Human Rights Act'" (quoting *Atl. Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1103 n. 6 (D.C.1986))); *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301 (D.C.1994) (noting that in interpreting the DCHRA, the D.C. Court of Appeals has "generally looked to cases from the federal courts involving claims brought under the Civil Rights Act of 1964 for guidance and have adopted those precedents when appropriate"). These cases do not support the proposition for which Diamond cites them, namely, that the DCHRA requires proof of intentional discrimination.

mond to prove a business necessity. Diamond has not attempted to show any business necessity.

Instead, Diamond's expert attempted to refute the reliability of plaintiffs' study by stating that the study did not control for possible causes of the difference in pickup rates. These possible causes included the proximity to downtown, the percent of the population who commute by cab and the crime rate for a given area. (*Id.* Ex. 10 at 3–4.) While Diamond's expert determined that these possible factors affected the likelihood of pickup, the expert did not even attempt to show that these possible causes accounted for the difference in pickup rates. (Pl.'s Mem. Ex. 10 at 3–6.) In Diamond's expert's own words, "I did not try to determine how much of the variation in the data is explained by [the suggested potential causes]." (*Id.* Ex. 10 at 6.) Because Diamond's expert did not conduct this analysis, he could not form an opinion about the cause for the difference in pickup rates. (Pl.'s Reply Ex. 1 at 77.)

Accordingly, Diamond's expert has not established that the difference in pickup rates was driven by factors other than race, let alone that these other factors are so compelling that they constitute a business necessity justifying Diamond's practice of picking up passengers in Anacostia at a lower rate than the rate for passengers from other portions of the District. In fact, plaintiffs, going beyond their burden under the DCHRA, had Dr. Miller study the factors unrelated to race mentioned by Diamond's expert. He concluded that those factors do not account for the difference in pickup rates. (Pls.' Mem. Ex. 12 at 1.)

Plaintiffs have shown that Diamond has a practice of picking up passengers who request service in Anacostia at a lower rate than that for passengers who request service in any other part of the District

and that this practice disproportionately bears on African–Americans. Diamond has not argued that this difference does not exist or offered any evidence showing that the difference is the result of a business necessity. As such, no genuine issue of material fact exists as to whether Diamond violated the protections afforded against race discrimination under D.C.Code §§ 2–1402.31, 2–1402.68 and judgment will be granted in the plaintiffs' favor on this count.

## C. DISCRIMINATION BASED ON RESIDENCE IN VIOLATION OF THE DCHRA (COUNT III)

■ Section 2–1402.31 of the D.C.Code also prohibits discrimination based on one's place of residence. Since Dr. Miller's report clearly shows that Diamond is significantly less likely to pick up a person requesting service from Anacostia than it is to pick up a person requesting service from another part of the city, and Diamond has not argued that this difference in pickup rates does not exist or that this difference in pickup rates is justified by some business necessity, no genuine issue of material fact exists as to whether Diamond violated the protections afforded by D.C.Code §§ 2–1402.31, 2–1402.68 against discrimination based on one's place of residence. Judgment will be granted in the plaintiffs' favor on this count.

## D. COMMON CARRIER DUTIES (COUNT IV)

Plaintiffs allege that Diamond has breached its duties as a common carrier. Diamond has moved for summary judgment arguing that plaintiffs have offered no evidence showing a breach by Diamond of its common carrier duties.

■ "The plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a

deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988) (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984)). The District of Columbia Court of Appeals, relying on Supreme Court precedent, has "stated that common carriers 'are bound to exercise extraordinary vigilance [aided] by the highest skill for the purpose of protecting their passengers against injury resulting from defects in ways or instrumentalities used by the carriers.' *This requirement has grown '[o]ut of the special solicitude [shown by the courts] for the safety of human cargo[.]'" Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 174 (D.C.1998) (quoting *Birchall v. Capital Transit Co.,* 34 A.2d 624, 625 (D.C. 1943)) (alterations in original) (emphasis added). In a breach of a common carrier duty claim, "the passenger has the burden of proving negligence, *i.e.,* that the carrier failed to exercise reasonable care under the circumstances." *Id.*

Here, plaintiffs have failed to offer any evidence showing that Diamond failed to exercise reasonable care in protecting its passengers from injury. Plaintiffs argue that a common carrier's duty is not just to prevent physical injuries to its passengers, but it is also to prevent acts of racial discrimination. To support the proposition that common carriers have a duty, based in tort, not to discriminate on the basis of race, plaintiffs cite only one case, *National Air Carrier Assoc. v. Civil Aeronautics Bd.,* 436 F.2d 185 (D.C.Cir. 1970), which arose back when airfares were still regulated. In that case, the court reversed the Civil Aeronautics Board's approval of certain transatlantic airfare agreements because the Board failed to adequately address whether the fares were anticompetitive and inherently discriminatory in an antitrust context. *Id.* at 197–98. In discussing its concern that the Board had not adequately considered, among other things, the potentially discriminatory effect of the fares, the court cited language from another circuit stating that the right to be treated nondiscriminatorily by a common carrier is derived from the common law. *Id.* at 198 (citing *Trailways of New England, Inc. v. CAB,* 412 F.2d 926, 931 (1st Cir.1969)). The court did not evoke this principle in a civil rights context, however, much less hold that such a common-law duty exists in the District of Columbia, or state that the duty applies to taxicab companies in a jurisdiction where it does exist. Plaintiffs' argument that it is well established in the District of Columbia that common carrier duties include the duty not to discriminate on the basis of race in the provision of taxicab services is not supported.

Plaintiffs have cited no authority establishing a common carrier duty not to discriminate on the basis of race, and they have not offered any evidence suggesting that Diamond failed to protect its passengers "against injury resulting from defects" in its cabs. Accordingly, defendant's motion for summary judgment will be granted as to this count.

## E. NEGLIGENT SUPERVISION (COUNT V)

Plaintiffs allege that Diamond negligently supervised its operators, dispatchers and cab drivers. Diamond has moved for summary judgment on this claim arguing that plaintiff has not made out a *prima facie* case of discrimination.

A claim alleging negligent supervision does not seek recovery under a theory of *respondeat superior.* Instead, it is an allegation of direct negligence. *See Brown v. Argenbright Security, Inc.,* 782 A.2d 752, 759–60 (D.C.2001). "'To invoke

this theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'"[14] *Id.* (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.1985)). Therefore, in order to state a negligent supervision claim, plaintiffs must show that: (1) Diamond's employees behaved in an incompetent manner; (2) Diamond had actual or constructive knowledge of this incompetent behavior; and (3) despite having this actual or constructive knowledge, Diamond failed to adequately supervise its employees.

■ Genuine issues of material fact exist as to whether the violations of plaintiffs rights under the DCHRA and the potential violations of plaintiffs' rights under § 1981, can be attributable to incompetent behavior on the part of Diamond's employees. Plaintiffs have produced the declarations of Watson and Tibbs showing that dispatchers frequently did not properly announce requests for service from Anacostia. (Pls.' Mem. Exs. 5 at 3–4; 6 at 3–4.) Plaintiffs have also presented evidence that Diamond did not provide its cab drivers with maps of Anacostia. Likewise, a genuine issue of material fact exists regarding Diamond's knowledge. While plaintiffs have not offered direct evidence of Diamond's knowledge of disparate pickup rates, a material dispute exists as to whether Diamond should be deemed to have constructive knowledge because of the gross disparity in pickup rates. Finally, Diamond has not argued that it took

steps to address the disparate pickup rates.

Accordingly, defendant's summary judgment motion will be denied with respect to this claim.

## IV. *Punitive Damages*

Diamond has also argued that it is entitled to summary judgment on the prayer for punitive damages for each of these counts. The standard for punitive damages under plaintiffs' federal claim differs from the standard for punitive damages for plaintiffs' remaining claims under District of Columbia law.

## A. PUNITIVE DAMAGES UNDER § 1981

■ The punitive damages standard for § 1981 is the same as the punitive damages standard under Title VII. *See Berger v. Iron Workers Reinforced Rodmen, Local 201,* 170 F.3d 1111, 1139 n. 17 (D.C.Cir.1999). Under Title VII, punitive damages are limited to those "cases in which the [defendant] has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *See Kolstad v. Am. Dental Assoc.,* 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting Rev. Stat. § 1977, as amended, 42 U.S.C. § 1981a(b)(1)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* at 535, 119 S.Ct. 2118. For a defendant's conduct to rise to this level,

---

**14.** Diamond cab drivers will be considered Diamond employees for the limited purpose of assessing this negligent supervision claim. The D.C. Court of Appeals has explained that even though the term "employee" is frequently used in articulating the standard for negli-

gent supervision, "it is clear from the Restatement [of Agency] and other authorities that a claim of negligent supervision does not require proof that the supervised person was also an employee or agent." *Brown,* 782 A.2d at 760 n. 11.

then, a defendant "must at least discriminate in the face of a perceived risk that its actions will violate federal law ...." *Id.* at 536, 119 S.Ct. 2118. However, to be awarded punitive damages, a plaintiff need not show that a defendant's conduct is independently egregious. *See id.* at 546, 119 S.Ct. 2118.

Here, a genuine issue of material fact exists as to whether Diamond was recklessly indifferent to whether it was acting in violation of federal law. The large disparity in pickup rates, the failure to provide those who drive Diamond cabs with maps of Anacostia, and the former employees' anecdotal accounts of Diamond employees violating the company's procedures for announcing a request for cab service when the request came from Anacostia (Pls.' Mem. Exs. 6 at 3; 7; 12) put Diamond's reckless indifference at issue. Accordingly, genuine issues of material fact exist regarding whether punitive damages are appropriate on the § 1981 claim, and Diamond's motion will be denied with respect to the § 1981 claim for punitive damages.

## B. PUNITIVE DAMAGES UNDER DISTRICT OF COLUMBIA LAW

Under District of Columbia law, "[p]unitive damages are properly awarded where the act of the defendant is accompanied by fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Rogers v. Ingersoll–Rand Company,* 971 F.Supp. 4, 12 (D.D.C.1997) (analyzing District of Columbia law on punitive damages). Put another way, to be awarded punitive damages, "[a] showing of evil motive or actual malice is ... required." *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372 (D.C.1993). "Proof of these elements may be inferred from the acts of

the defendant and from circumstantial evidence." *Rogers,* 971 F.Supp. at 12. "The issue is ordinarily one for the trier of fact." *Id.*

Here, it would also be inappropriate to take the issue of punitive damages away from the trier of fact. Plaintiffs have presented evidence of gross disparities in pickup rates, admissions by Diamond's management that it did not provide maps of Anacostia to the cab drivers who bore the company's emblem and colors, and anecdotal accounts of Diamond employees throwing call slips from Anacostia and other parts of Southeast in the trash, sometimes without even announcing the request for service once. (Pls.' Mem. Exs. 6 at 3; 7; 12.) At this point, a genuine issue of material fact exists about whether Diamond acted out of ill will or willfully disregarded plaintiffs' rights. Thus, Diamond's motion for summary judgment on plaintiffs' request for punitive damages under the DCHRA and District of Columbia tort law will be denied.

## *CONCLUSION*

Because genuine issues of material fact exist as to plaintiffs' § 1981 claim in Count I and plaintiffs' negligent supervision claim in Count V, Diamond's motion for summary judgment will be denied with respect to those counts. Diamond's motion for summary judgment will be granted as to plaintiffs' claims of breach of common carrier duties, fraudulent misrepresentation and intentional infliction of emotional distress in Counts IV, VI and VII respectively, because no genuine issues of material fact exist with respect to those claims and Diamond is entitled to judgment as a matter of law. With respect to plaintiffs' claims under the DCHRA in Counts II and III, Diamond's motion for summary judgment will be denied and plaintiffs' motion for summary judgment will be granted.

Plaintiffs have established prima facie cases of race-based and residence-based discrimination under the DCHRA and Diamond has offered neither argument nor evidence that could either undermine plaintiffs' showing of discrimination or rebut their prima facie case. Accordingly, it is hereby

ORDERED that Diamond's motion for summary judgment [38–1] be, and hereby is, GRANTED IN PART, AND DENIED IN PART. Diamond's motion for summary judgment is granted with respect to Counts IV, VI and VII. Diamond's motion is denied with respect to all of the remaining counts. It is further

ORDERED that plaintiff's cross-motion for summary judgment on Counts II and III [41–1] be, and hereby is, GRANTED. It is further

ORDERED that a status conference will be held in this matter on _____ at _____.